AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

FILED

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>One black Motorola cellphone, currently stored at<br>1001 Indian School Road NW, Albuquerque, NM 87114 | )<br>)<br>)<br>)<br>)<br>) |

Case No.   24-MR-1558

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated by reference.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and<br>(b)(1)(A) | Possession with intent to distribute 500 grams and more of a mixture<br>and substance containing methamphetamine. |

The application is based on these facts:

See attached affidavit, submitted by SA Jared Shupla.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jared Shupla, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
___Telephonically sworn and electronically signed___ *(specify reliable electronic means).*

Date:   08/22/2024

_____
*Judge's signature*

City and state:   Albuquerque, NM

Honorable B. Paul Briones, Magistrate Judge
_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ONE BLACK MOTOROLA CELLPHONE CURRENTLY STORED AT 1001 INDIAN SCHOOL ROAD NW, ALBUQUERQUE, NM 87114 | Case No. _____     24-MR-1558 |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Jared Shupla, Special Agent with the Bureau of Indian Affairs (BIA) United States Department of the Interior currently assigned to the Division of Drug Enforcement and a Task Force Officer (TFO) with the Department of Homeland Security, Homeland Security Investigations (HSI), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—one electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.  For the reasons stated herein, I believe there is probable cause to conclude that the electronic device at issue contain records or information that will be evidence of or relating to violations of 21 U.S.C. §§ 841 (a)(1) and (b)(1)(A), that being, possession with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine.

2.      I am a Special Agent with the BIA and have been since April 2022.  As such, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations and to make arrests for criminal offenses, to

include those enumerated in 18 U.S.C. § 2516. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.      I began my law enforcement career in 2002 when I enlisted into the United States Army and served honorably for eight years active duty as a military policeman. I successfully completed Basic Combat Training and Advanced Individual Training, United States Army Military Police School. I received over 500 hours of law enforcement training techniques, focusing on investigative techniques, patrol skills, report riding, emergency vehicles operators' course, convoy security techniques, forward operating prisoner of war operations and military operations in urban terrain. While serving in the US Army I served as a Patrolman, Patrol Supervisor, Vehicle Coordinator, Driver, Team Leader, Squad Leader and Desk Sergeant.

4.      After being honorably discharged from the US Army, in October 2010 I was employed with the Pueblo of Acoma Police Department as a Patrolman. I attended and graduated from the Federal Law Enforcement Training Center Land Management Patrol Techniques class, where I served as squad leader.  I was trained in the investigation of crimes such as, DUI's, assaults, domestic violence, vehicle collisions, death investigations, archeological violations.

5.      In May 2012, I was employed by the Santa Clara Tribal Police Department where I served as a police officer. As a police officer with Santa Clara Tribal Police Department, I upheld and enforced the laws and tribal customs of the Santa Clara Pueblo. I served as the Indian Highway Safety Officer for the Santa Clara Police Department. I enforced all traffic laws set forth by the Santa Clara Tribal Code within the exterior boundaries of the Santa Clara Pueblo, which included intercity roads of the City of Espanola and the county roads of Rio Arriba County. I investigated allegations of DUI's and responded to traffic collisions. I coordinated and oversaw the operation

2

of several DUI checkpoints. I served as a liaison for the Santa Clara Tribal Police Department in collaboration with the Rio Arriba DWI Program. I compiled statistics for all traffic stops, DUI arrests, traffic collisions and citations issued by the Tribal Police Department for the DWI program.

6.      In October 2016, I became a Federal K9 Officer with the BIA Division of Drug Enforcement. I conducted intercity and highway interaction with vehicles and individuals responsible for human trafficking, transportation of illegal narcotics, illegal weapons, and large sums of U.S. currency and off tribal land. I have conducted multiple investigations relating to violations of the Major Crimes Act and federal narcotic violations. I have conducted several criminal narcotics investigations in my respective assigned duty station and have issued summons through the Central Violations Bureau (CVB). I successfully completed a four-week K9 handlers' course in Muskogee, Oklahoma. I was trained to detect the change in behavior of my K9 partner that led to the detection of illegal narcotics.

7.      I am currently assigned to the Albuquerque Office Division of Drug Enforcement of the BIA as a Special Agent and have primary investigative responsibility in federal drug violations occurring in Indian Country. I am also a Task Force Officer with the Department of Homeland Security, Albuquerque Office. I have completed the seven-week Department of the Interior Investigators training program in Brunswick, Georgia. I received training on conducting long term investigations, crime scene processing, surveillance, report writing, control tactics and crime scene photography. I am a certified Cellebrite operator and have extracted information from locked and unlocked phones for which I received access either by written consent and/or pursuant to a search warrant.

8.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.

9.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

10.      The property to be searched consists of one cellular telephone, as described in Attachment A and B (hereinafter referred to as the "Device") and is identified as follows:

> One black Motorola phone sealed in a self-sealing Evidence bag #C0034050624. The Device has a grey Motorola emblem printed on the back of the phone. The Device is currently located in evidence at 1001 Indian School Road NW, Albuquerque, NM 87114.

11.      The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## DRUG TRAFFICKING AND CELLULAR DEVICES

12.      Based upon my training and experience, and on my consultation with other law enforcement officers experienced in investigations regarding conspiracy to manufacture, distribute and possess with intent to distribute controlled substances, I have learned the following:

> a.      Those who possess illegal drugs for distribution often use electronic devices such as wireless or cellular telephones and smartphones. Such electronic devices are often used to communicate with coconspirators and customers through the telephone's standard capabilities to call and text, as well as through smartphone applications ("apps") such as WhatsApp, Snapchat, Pinger, Marco Polo and Facebook, which allow users to send and receive digital communications in various forms such as voice calls, text messages, image

and video sharing, and live video conversations. Records of these communications, text messages, and contact lists are frequently retained and stored on those electronic devices and within those apps. Based upon my training, experience, and knowledge of this investigation, I believe that such evidence and information is likely to be found in the Device.

      b.      Individuals involved in the illegal trafficking of controlled substances often maintain documents, records, and other evidence of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers. All such records can also be produced and/or stored on cellular telephones and evidence of these transactions is often contained within cellular phones.

      c.      Drug dealers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, hotel and gas receipts, and passports

and visas and their contents. Many of these items are accessible via the internet and can be downloaded and saved on the computer or other media such as cellular phones.

      d.     Drug trafficking is a crime that necessarily involves at least two people – a buyer and a seller. Prior to engaging in the drug transaction, the buyer and seller must communicate and discuss the type of drug to be sold, the quantity, the price, and the location where the sale will take place. I know that drug dealers and their customers make use of cellular phones and smartphones to conduct these necessary communications.

      e.     Information stored in electronic form on cellular telephones can provide evidence of drug trafficking and the identity of associates. For example, numbers stored on cellular telephones (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of associates.

      f.     Drug dealers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property, drug trafficking records, records of financial transactions involving drug trafficking proceeds, their drugs, and firearms. They usually take these photographs and/or videos with their cellular phones and store them in those cellular phones.

      g.     I know that those engaged in drug trafficking have access to, and utilize, numerous cellular telephones, often at the same time in an effort to avoid law enforcement monitoring.

      h.     Electronic information can remain on computer storage media, such as within cellular phones, for an indefinite period of time. I am aware that even when a user

attempts to delete records from computer storage media, the records may still exist and be recovered through computer forensic techniques.

### POSSESSION OF FIREARMS IN FURTHERANCE OF A DRUG TRAFFICKING CRIME AND CELLULAR DEVICES

13.     Based upon my training and experience, and on my consultation with other law enforcement officers experienced in investigations regarding possession of firearms in furtherance of a drug trafficking crime, I have learned the following:

a.      Those who possess firearms in furtherance of a drug trafficking crime often use electronic devices such as wireless or cellular telephones and smartphones. Such electronic devices are often used to communicate with coconspirators through the telephone's standard capabilities to call and text, as well as through smartphone applications ("apps") such as WhatsApp, Snapchat, Pinger, Marco Polo and Facebook, which allow users to send and receive digital communications in various forms such as voice calls, text messages, image and video sharing, and live video conversations. Records of these communications, text messages, and contact lists are frequently retained and stored on those electronic devices and within those apps. Based upon my training, experience, and knowledge of this investigation, I believe that such evidence and information is likely to be found in the Device.

b.      Those who possess firearms in furtherance of a drug trafficking crime often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property, and firearms. They usually take these photographs and/or videos with their cellular phones and store them in those cellular phones.

c.      Electronic information can remain on computer storage media, such as within cellular phones, for an indefinite period of time. I am aware that even when a user

attempts to delete records from computer storage media, the records may still exist and be recovered through computer forensic techniques.

## **PROBABLE CAUSE**

14.     On July 24, 2024, at or about 09:05 a.m. K-9 Officer N. Jackson was on duty, in full uniform, in his marked K9 patrol unit. Officer Jackson was monitoring traffic on the eastbound lane of Interstate 40 monitoring traffic near the mile marker 127. While monitoring traffic, Officer Jackson observed what was later identified as a black, 2021 Nissan Altima bearing California license plate 9FWN458. K9 Officer Jackson observed the vehicle traveling east while approaching mile marker 127. As the vehicle was approaching the exit, K9 Officer Jackson observed the vehicle appear to be traveling higher than the posted speed limit of 75 miles per hour. K9 Officer Jackson was equipped with his department-issued Kustom Signal Pro-Lite+ (LIDAR) speed measuring device.

15.     K9 Officer Jackson conducted a visual speed estimation of the sedan traveling alone at the time with no other vehicles present in between them in the fast lane, attempting to pass another vehicle. K9 Officer Jackson utilized the LIDAR to obtain a high speed of 80 miles per hour. K9 Officer Jackson continued tracking the sedan before locking the speed in at 79 miles per hour. As K9 Officer Jackson caught up to the sedan, he observed the sedan reducing its speed below 70 miles per hour as the operator of the sedan appeared to notice the marked unit closing distance. K9 Officer Jackson conducted a traffic stop on the sedan for speeding. During this time, K9 Officer Jackson activated his dash camera (audio/video) to record the violation and traffic stop.

16.     K9 Officer Jackson conducted a traffic stop at about the 126/127 mile markers. Upon initial contact with the driver the vehicle, the driver was identified as Anastacio RIVERA-HERNANDEZ, (RIVERA-HERNANDEZ). A female passenger later identified as Jennifer

OCHOA-NEREY informed K9 Officer Jackson that RIVERA-HERNANDEZ does not speak English and was willing to translate their conversation in English. K9 Officer Jackson told RIVERA-HERNANDEZ to exit the vehicle and come to his marked Police K9 vehicle.

17.     K9 Officer Jackson then went back to the patrol vehicle and greeted RIVERA-HERNANDEZ. K9 Officer Jackson pointed to RIVERA-HERNANDEZ to enter the front passenger seat of the patrol vehicle. Once inside the patrol vehicle, K9 Officer Jackson immediately contacted the language translation line provided to him by HSI Tack Force and chose Spanish for the language. During the translation portion of the phone call and while actively working on the warning citations for the traffic stop, K9 Officer Jackson engaged RIVERA-HERNANDEZ in general conversations about his travels with OCHOA-NEREY.

18.     While K9 Officer Jackson completed his enforcement phase of the traffic stop, BIA DDE K9 Officer Williams arrived on scene and simultaneously deployed his narcotic detections canine K9 "Demon" for an external air sniff around the vehicle. K9 Officer Williams later advised K9 Officer Jackson that his K9 did alert to the presence of narcotics which he is trained to detect. K9 Officer Jackson asked for consent to search the vehicle for any narcotics. RIVERA-HERNANDEZ denied consent to a search of the vehicle. K9 Officer Williams simultaneously asked OCHOA NEREY for consent, which she also denied consent.

19.     After K9 Officer Jackson issued two warning citations to RIVERA-HERNANDEZ, he informed RIVERA-HERNANDEZ that he would be conducting a probable cause search of the vehicle. K9 Officer Williams and K9 Officer Jackson then conducted a search of the sedan's interior and notice no visible luggage or clothing indicating even anything for a one-day trip. After moving the search to the trunk, K9 Officer Jackson noticed two boxes of food savers bags, a backpack and a suitcase covered by a blanket. After removing the blanket and puling the suitcase

closer, K9 Officer Jackson noticed the weight of the suitcase was extremely heavy. Upon Opening

the suitcase, officers observed multiple Ziploc bags containing a crystal-like substance suspected

to be methamphetamine.

20.     After locating all illegal substances, K9 Officer Jackson later weighed, and field

tested the crystal- like substance with the Tru Narc Device which gave a positive presumptive test

for Methamphetamine. A total weight of 27.26 kilograms of suspected methamphetamine was

seized, placed into evidence and will be sent to a laboratory for further analyses.

21.     Both RIVERA-HERNANDEZ and OCHOA-NEREY were later transported along

with the vehicle to the Homeland Security Office in Albuquerque. A mirandized interview was

conducted by HSI Special Agent Ramon, a native Spanish speaker at which time RIVERA-

HERNANDEZ gave written consent to a search of his iPhone 13, model: MLML3LL/A, serial

number: D34NW95JYQ. During the interview RIVERA-HERNANDEZ did not wish to provide

any information regarding the suspected narcotics. The interview was concluded at this time. It

should be noted that OCHOA-NEREY was also found to be in possession of an iPhone which she

also gave written consent to a search during her mirandized interview. It was later discovered that

a third phone was located inside vehicle by Special Agents during a secondary search of the

vehicle. OCHOA-NEREY identified the phone as belonging to RIVERA-HERNANDEZ.

RIVERA-HERNANDEZ was shown the phone and was asked if he would consent to a search of

the phone. RIVERA-HERNANDEZ denied consent. The phone was found to have a pattern

passcode that was in a locked state. The Device is described as a Black Motorola phone with a

grey Motorola emblem on the back of the phone. No other information such as make, model, serial

number or IMEI were obtained from the phone as it was in a locked status. During a search of

RIVERA-HERNANDEZ's iPhone 13, several photos were located in the deleted photo album

depicting large zip lock bags containing a large amount of a white crystal-like substance very similar to the suspected narcotics seized during the traffic stop. These photos were taken by the phone's camera on July 9th, 2024, at 4:43 p.m.

22.     Further investigation also revealed a second vehicle described as a white Honda Civic bearing a California license plate was also traveling in tandem with RIVERA-HERNANDEZ. After taking notice of the Honda Civic, this information was passed to adjoining counties, state agencies and tribal agencies in an attempt to stop and identify the occupants of the vehicle.

23.     Based on my training and experience, I have learned that people who transport controlled substances often collect the controlled substances at locations they are unfamiliar with and must often deliver them to other locations with which they are not familiar. I have learned that these individuals are often given strict timetables and schedules for their trips. I know that they will often rely on Global Positioning Systems ("GPS") to guide them to the locations where they are to pick up the controlled substances and provide them with efficient routes in order to reach their final destinations on schedule.  I have learned that smart devices such as the Device can be used with a variety of GPS and navigation programs, which provide users with directions to and from specific locations.  Therefore, I believe the Device may have been used by RIVERA-HERNANDEZ to find the location where he received the controlled substances and the location to which he was supposed to deliver them and/or the other people involved.

24.     Based on my training and experience, I have learned that individuals involved in trafficking-controlled substances often use their wireless phones and tablets to communicate with each other regarding their crimes.  These individuals can use their wireless telephones and tablets to communicate through telephone calls, text messages, e-mails, and through mobile applications

such as Facebook Messenger, WhatsApp, Kik Messenger, Instagram, Snapchat, and others. I have learned that these individuals often document their co-conspirators as contacts in their wireless telephone's contact list or phonebook and document activities such as meetings, deliveries, and payments in their phones' calendar or notepad application. I have learned that these individuals often use their wireless phones to access their bank accounts and interact with funds that were derived from their criminal activities as well as to transfer those funds using applications such as Zelle, QuickPay, PayPal, Venmo, and others. I have learned that individuals will often use the GPS capabilities of their wireless telephones to guide them to locations at which they engage in their criminal activities.  For these reasons, I believe the Device likely contains evidence of RIVERA-HERNANDEZ's drug trafficking activities.

25.     Based on the events described above, there is probable cause to believe that the Device will contain evidence of RIVERA-HERNANDEZ's drug trafficking activities, specifically violations of 21 U.S.C. § 841(a)(1) and (b)(1)(A). The Device is currently in the lawful possession of the BIA.  As described above, the Device came into the possession of BIA subsequent to the arrest of RIVERA-HERNANDEZ on July 24, 2024.

26.     In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of BIA.

## **TECHNICAL TERMS**

27.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through

radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.      Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.      Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media

include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.      GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records of the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most

14

PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by devices that access the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every device attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that device may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some devices have static—that is, long-term—IP addresses, while other devices, particularly mobile devices, have dynamic—that is, frequently changed—IP addresses.

g.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

28.    Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications, available online for the Device, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, PDA, and to access the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

29.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on such devices.  This information can sometimes be recovered with forensics tools.

30.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of that use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.      Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend

on other information stored on the computer and the application of knowledge about how a computer behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

31.   *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the D**evice** consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

32.   *Manner of execution.*   Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

33.   I submit that this affidavit supports probable cause for search warrants authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

34.   AUSA Elaine Ramirez reviewed and approved this affidavit.

Respectfully submitted,

_____

Jared Shupla

Special Agent
Bureau of Indian Affairs

Subscribed electronically and sworn telephonically on
August 22, 2024.

_____
HONORABLE B. PAUL BRIONES
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**
**Item to be Searched**

The property to be searched is a One Black Motorola Cellphone with a Motorola emblem on the back of the phone. No model serial number or IMEI was obtained from the Device due to the Device being in a locked state. The Device was placed in a self-sealing Evidence bag # C0034050624. The Device is currently located in evidence at 1001 Indian School Road NW, Albuquerque, NM 87114.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

 



**ATTACHMENT B**
**Items to be Seized**

1.      All records and information on the Device described in Attachment A that relate to violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), possession with intent to distribute controlled substances, including:

     a.   data and information identifying co-conspirators, customers, and suppliers;

     b.   communications between co-conspirators, customers, and suppliers;

     c.   data and information regarding the types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

     d.   data and information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

     e.   any photographs, videos and audio files related to the crimes listed above;

     f.   financial records or other information regarding the expenditure or disposition of proceeds from the distribution of controlled substances including all bank records, checks, credit card bills, account information, and other financial records; and

     g.   records of travel.

2.      All records on the Device which constitute evidence, fruits, and instrumentalities of 18 U.S.C. § 924(c), possession of a firearm in furtherance of a drug trafficking crime, including:

     a.   data and information identifying co-conspirators, customers, and firearms suppliers;

     b.   communication with or among co-conspirators, suppliers, or customers related to the crime listed above;

    c.   information related to any firearm used during the course of the crime listed above, including the identities of who owned, possessed, and used the firearms during the course of the crimes;

    d.   data and information regarding the types, amounts, and prices of firearms trafficked as well as dates, places, and amounts of specific transactions;

    e.   any photographs, video and audio files related to the crime listed above;

    f.   financial records or other information regarding the expenditure or disposition of proceeds from the trafficking of firearms, including all bank records, checks, credit card bills, account information, and other financial records; and

    g.   records of travel.

3.    Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the BIA may deliver a complete copy of the seized or copied

electronic data to the custody and control of attorneys for the government and their support staff for their independent review.